**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X      Docket No.:

SHERONICA OUTLAW,

                              Plaintiff,      **COMPLAINT**

           -against-

BOB'S DISCOUNT FURNITURE, LLC, ROBERT       **PLAINTIFF DEMANDS**
CRISTODORA, *individually*, and JOHN JACKSON,       **A TRIAL BY JURY**
*individually*,

                         Defendants.

-------------------------------------------------------------------X

      Plaintiff, SHERONICA OUTLAW ("OUTLAW"), by her attorneys, PHILLIPS &

ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants by alleging

and averring as follows:

## NATURE OF THE CASE

1.     This is the case of an employer -- BOB'S DISCOUNT FURNITURE, LLC ("BOB'S

        DISCOUNT FURNITURE") – which prides itself on providing "quality furniture … in a

        fun and haggle-free environment … [with] [n]o hassles," condoning a racially charged

        hostile work environment in at least one of its stores, and ultimately firing its employees –

        Plaintiff OUTLAW – when she continued to complain about the racist harassment she was

        forced to endure while working there.

2.     Plaintiff OUTLAW brings this action alleging that Defendants have violated Title VII of

        the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, *et seq.* (amended in 1972,

        1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"); and the New

        York State Human Rights Law, New York State Executive Law, §§ 296, *et seq.*

        ("NYSHRL").

3.     Plaintiff OUTLAW seeks damages, as well as injunctive and declaratory relief, to redress

the injuries she has suffered – physical, emotional and pecuniary – as a result of being discriminated and retaliated against by her employer on the basis of her race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

## JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

4.      Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

5.      The Court has supplemental jurisdiction over the claims Plaintiff OUTLAW has brought under state law pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more of the Defendants reside within the Southern District of New York or the acts complained of occurred therein.

7.      By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 16, 2018; (b) receiving a Notice of Right to Sue from the EEOC on August 2, 2019; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, Plaintiff OUTLAW has satisfied all of the procedural prerequisites for the commencement of the instant action.  A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## PARTIES

8.      At all times relevant hereto, Plaintiff OUTLAW is and has been a resident of the State of New York, County of Dutchess.

9.      At all times material, Defendant BOB'S DISCOUNT FURNITURE was and is a limited liability corporation operating in and existing under the laws of the State of Massachusetts.

10. Upon information and belief, Defendant BOB'S DISCOUNT FURNITURE owns and/or operates a furniture store located at South Hills Mall, 1895 South Road (Route 9), Poughkeepsie, New York 12601 (the "Poughkeepsie Location").

11. At all times relevant hereto, Plaintiff OUTLAW was and is currently an employee of Defendant BOB'S DISCOUNT FURNITURE.

12. At all times relevant hereto, Defendant ROBERT CRISTODORA ("CRISTODORA") was and is currently an employee of Defendant BOB'S DISCOUNT FURNITURE, holding the position of "Store Manager."

13. Defendant CRISTODORA was and is currently Plaintiff OUTLAW's supervisor and/or had supervisory authority over her. Specifically, Defendant CRISTODORA had and has the authority to hire, terminate, and/or affect the terms and conditions of Plaintiff OUTLAW's employment, or to otherwise influence the decision maker of the same.

14. That at all times relevant hereto, Defendant JOHN JACKSON ("JACKSON") was and is currently an employee of Defendant BOB'S DISCOUNT FURNITURE, holding the position of "Human Resources ('H.R.') Director."

15. Defendant JACKSON was and is currently Plaintiff OUTLAW's supervisor and/or had supervisory authority over her. Specifically, Defendant JACKSON had and has the authority to hire, terminate, and/or affect the terms and conditions of Plaintiff OUTLAW's employment, or to otherwise influence the decision maker of the same.

16. Upon information and belief, Defendant CRISTODORA is white male.

17. Upon information and belief, Defendant JACKSON is a black male.

18. Defendants BOB'S DISCOUNT FURNITURE, CRISTODORA, and JACKSON are, at times, collectively referred to herein as "Defendants."

**MATERIAL FACTS**

19.   On or about January 23, 2017, Defendant BOB'S DISCOUNT FURNITURE hired Plaintiff OUTLAW as a "Sales Consultant."

20.   At the time she was hired, Plaintiff OUTLAW worked Friday to Tuesday, with differing shifts each day. On Mondays, she worked from 10:45AM until 8:00PM; on Tuesdays, she worked from 10:00AM until 6:00PM; on Fridays, she worked from 12:45PM until 9:30PM; on Saturdays, her schedule rotated between 9:45AM until 5:30PM and 1:15PM to 930PM; and on Sundays, her schedule rotated between 9:30AM until 5:00PM and 11:30AM until 7PM.

21.   Plaintiff earned an hourly rate of $13.25 per hour.

22.   Thus, Plaintiff OUTLAW had an expected 2018 salary of $27,560.00, plus the value of her benefits, including but not limited to, commissions earned from sales.

23.   Soon after she was hired, in or about the middle of February 2017, Plaintiff OUTLAW experienced a work environment permeated with discrimination based on her race (African American), sexual orientation, and gender, whether actual or perceived; and she began to suffer the consequences of this hostile work environment.

24.   Particularly and most egregiously, on or about April 21, 2018, Defendant CRISTODORA asked Plaintiff OUTLAW, Denise Davis, a Part-Time Sales Consultant, and Michael Rosa, a Sales Consultant, why they were just standing around on the sales floor. Plaintiff OUTLAW, Ms. Davis and Mr. Rosa answered Defendant CRISTODORA that they were assisting customers.

25.   Upon information and belief, Ms. Davis is an African American female and Mr. Rosa is a white male.

26.   In response, Defendant CRISTODORA observed that the two African American females

4

looked "like the circus animals" and Mr. Rosa, the white male, "was the ringleader of the circus."

27. Plaintiff OUTLAW as well as – upon information and belief -- Ms. Davis and Mr. Rosa understood this to be a racially charged discriminatory comment and were deeply offended.

28. This comment by Defendant CRISTODORA also reinforced the racial stereotypes that Defendants had about their African American employees, as compared to their Caucasian employees.

29. Shortly thereafter, on or about June 5, 2018, Plaintiff OUTLAW had a meeting with Defendants CRISTODORA and JACKSON to discuss the continuous discriminatory treatment that she had been facing since the beginning of her employment because of Defendants' unlawful conduct.

30. During this meeting, Plaintiff OUTLAW provided Defendant JACKSON with examples of: (a) the discriminatory and hostile work environment; (b) disparate treatment, as compared to the white employees; and (c) Plaintiff OUTLAW being singled out.

31. In defense of the discriminatory conduct of Donna Ramaglia described immediately above, Defendant JACKSON told Plaintiff OUTLAW, "you know women…women can be catty with each other."

32. Plaintiff OUTLAW was especially offended by Defendant JACKSON's discriminatory comment based on her gender/sex and because it was coming directly from a human resources professional who should certainly know better.

33. In addition, both men made it appear that the problem was not the other employees' discriminatory conduct, but rather Plaintiff OUTLAW's alleged inappropriate responses to that unlawful conduct.

34. Moreover, Defendant JACKSON told Plaintiff OUTLAW that Cindy Beauchard, a Human

Resources Employee who had previously addressed Plaintiff OUTLAW's complaints, was "lazy" and is not good with following up on problems.

35. This comment reinforces the racial stereotype that black women are lazy and cannot follow through with anything that they do.

36. Furthermore, Defendant JACKSON told Plaintiff OUTLAW that he had met Defendant CRISTODORA for the first time, when they had lunch earlier that day and Defendant JACKSON concluded from that meeting that Defendant CRISTODORA was not a "prejudicial man."

37. Thus, Defendant JACKSON, a supposed Human Resources professional, engaged in gender-based and race-based stereotyping, as well as evidencing a caviler disregard for the existence of a hostile work environment.

38. This disastrous meeting with human resources was a culmination of Defendant BOB DISCOUNT FURNITURE's well-established, continuous, and ongoing hostile work environment, based on Plaintiff OUTLAW's race (African American), sexual orientation, and gender, whether actual or perceived.

39. From in or around the middle of February 2017 until in or around the beginning of March 2017, Plaintiff trained with Amy Rosen, Floor Manager, and Defendant CRISTODORA, in order to learn what was required for her position as a Sales Consultant.

40. Soon thereafter, Ms. Rosen and Defendant CRISTODORA permitted Plaintiff to begin working on the sales floor selling furniture, as she was a fast learner.

41. On her first day on the sales floor, the following coworkers, all holding the same position of Sales Consultant, began to harass Plaintiff OUTLAW on the basis of her race: Ms. Ramaglia, Angela Cacace, Donna Blakemore, Kaitlyn Krebs, and Joseph Haubrich.

42.     Upon information and belief, Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, and Ms. Krebs are white females. In addition, upon information and belief, Mr. Haubrich is a white male.

43.     Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich all called Plaintiff a snake because she used to work at car dealerships in Bronx, New York.

44.     In addition, Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich, told Plaintiff that they would not help Plaintiff and would do anything to get Plaintiff fired.

45.     Soon thereafter, Plaintiff went into the manager's office, and complained, to Ms. Rosen and Defendant CRISTODORA, that she was working on the floor and that Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich were harassing her. Plaintiff OUTLAW reiterated that her coworkers were calling her a snake and saying that they were going to try to get her fired.

46.     Ms. Rosen and Defendant CRISTODORA dismissed Plaintiff OUTLAW's concerns and stated that others had gone through this type of conduct because people are jealous of new employees, "like her." Ms. Rosen and Defendant CRISTODORA continued that Plaintiff OUTLAW should not come to them for "everything" and needed to first try to work out her differences with the other salespeople.

47.     Offended by the inappropriate response, Plaintiff OUTLAW told Defendant CRISTODORA that she wanted him to talk to the other employees because she wanted to work in an environment free of racial hostility.

48.     Ms. Rosen and Defendant CRISTODORA responded that they would talk to the other employees and that Plaintiff should go back to work. In addition, they told Plaintiff that if Plaintiff had a problem afterwards to talk to them and let them know if the conduct of her coworkers "goes too far."

49.   Upon information and belief, Ms. Rosen and Defendant CRISTODORA acquiesced to the discriminatory conduct by not talking to Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich.

50.   Upon returning to the sales floor, Ms. Ramaglia and Ms. Cacace accosted Plaintiff OUTLAW and rudely asked her why she had the right to be on the sales floor, when they had been required to train in New Jersey, before getting onto the sales floor.

51.   Plaintiff OUTLAW responded that it was a decision made by management and if there was an issue they should speak with Ms. Rosen and/or Defendant CRISTODORA.

52.   Soon thereafter, upon information and belief, Ms. Ramaglia and Ms. Cacace complained to management.

53.   A few days later, Ms. Rosen and Defendant CRISTODORA pulled Plaintiff OUTLAW from the sales floor and reassigned her to in-house training for approximately another two weeks.

54.   Since then, on almost a daily basis, Ms. Cacace and Ms. Ramaglia harassed Plaintiff OUTLAW by telling her that she did not know the rules and threatening Plaintiff that there would be problems if she stole their customers.

55.   Despite Plaintiff OUTLAW politely asking Ms. Cacace and Ms. Ramaglia to leave her alone, Ms. Cacace and Ms. Ramaglia continued their harassment of Plaintiff OUTLAW in hopes that she would quit or get fired.

56.   For example, when Plaintiff OUTLAW would put her name on an "Up Sheet," which was used to assign a Sales Consultant to a customer, Ms. Cacace and Ms. Ramaglia would cross Plaintiff OUTLAW's name off, in order to push her to the bottom of the list. This maneuver prevented Plaintiff OUTLAW from obtaining commissions on sales. This conduct by Ms. Cacace and Ms. Ramaglia occurred on almost a daily basis.

57. In or around April 2017, Plaintiff OUTLAW filled out a credit card application for a customer. Soon thereafter, the application was removed from Plaintiff OUTLAW's desk, which was located in or around the middle of the store.

58. Almost immediately, Plaintiff OUTLAW went to complain to Defendant CRISTODORA. Defendant CRISTODORA responded that he would have the camera crew check to see what happened. Soon thereafter, Defendant CRISTODORA told Plaintiff that it was okay and he would handle the issue.

59. Shortly thereafter, but still in or about April 2017, Defendant CRISTODORA called Plaintiff OUTLAW into the manager's office, and informed her that Ms. Ramaglia had accused Plaintiff OUTLAW of touching Ms. Ramaglia in a sexually inappropriate manner.

60. In shock, Plaintiff OUTLAW conclusively denied the accusations. Specifically, Plaintiff OUTLAW told Defendant CRISTODORA that she would not touch anyone in that manner and that she was not a gay woman. Plaintiff OUTLAW continued that she would appreciate if Defendant CRISTODORA would investigate this matter and clear up the false accusations made against her.

61. Plaintiff OUTLAW also asked where she had allegedly touched Ms. Ramaglia but Defendant CRISTODORA could not provide a response because he said he did not ask Ms. Ramaglia and was only trying to understand what had happened.

62. Defendant CRISTODORA proceeded to tell Plaintiff OUTLAW that a number of sales persons were complaining about how aggressive Plaintiff OUTLAW was on the sales floor. Plaintiff OUTLAW asked who complained about her but Defendant CRISTODORA did not provide a response.

63. Upon information and belief, Ms. Ramaglia's claims were investigated and determined to be unfounded and baseless accusations against Plaintiff OUTLAW. However, Ms.

Ramaglia was never reprimanded for making such false allegations. Thus, Defendants acquiesced to the discriminatory conduct of Ms. Ramaglia against Plaintiff OUTLAW, which caused Plaintiff OUTLAW to be subjected to a hostile work environment based on her race (African American) and sexual orientation, whether actual or perceived.

64.     In addition, the allegation that Plaintiff was "aggressive" continued to reinforce the racial stereotypes that Defendants had about their African American employees, as compared to their non-African American employees.

65.     In or around May 2017, Defendant CRISTODORA began taking away Plaintiff OUTLAW's commissions and giving them to Ms. Krebs, Ms. Cacace, and Mr. Haubrich. This was done without any explanation to Plaintiff OUTLAW.

66.     Upon information and belief, Ms. Krebs, Ms. Cacace, and Mr. Haubrich would complain to Defendant CRISTODORA that Plaintiff OUTLAW had allegedly stolen their customers.

67.     Approximately twice a week, Plaintiff OUTLAW complained to Defendant CRISTODORA and Ms. Rosen about being singled out on the sales floor, by the white employees (particularly Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich).

68.     Defendant CRISTODORA typically responded that "this was not a black and white situation" and that such friction occurred with all of the new employees, and would smooth out over time.

69.     On at least one occasion, Plaintiff OUTLAW explained to Defendant CRISTODORA that in this short period of time, she was called a "liar," and was accused of sexually harassing another female employee. Plaintiff OUTLAW continued that she felt that Defendant CRISTODORA was acquiescing to the discriminatory conduct of her white coworkers against her.

70. Defendant CRISTODORA's response reinforced Defendant BOB'S DISCOUNT FURNITURE's disparate treatment between employees based on their race, by attempting to disregard Plaintiff's complaints.

71. From in or around July 2017 until in or around September 2017, Ms. Ramaglia, Ms. Cacace, Ms. Blakemore, Ms. Krebs, and Mr. Haubrich, continued to subject Plaintiff OUTLAW to a discriminatory and hostile work environment based on her race.

72. On or about July 18, 2017, Plaintiff OUTLAW came to work and learned that Defendant CRISTODORA gave Ms. Krebs half of Plaintiff's commissions from a furniture sale.

73. Upon information and belief, the rules of Defendant BOB'S DISCOUNT FURNITURE state that if a customer does not ask for a particular sales consultant, at the door, then that customer is no longer that sales consultant's customer.

74. Soon thereafter, Plaintiff OUTLAW asked Ms. Krebs how Ms. Krebs got her name on the deal in question and Ms. Krebs responded that Plaintiff OUTLAW was a thief and to get away from her, before there was a big problem. Plaintiff OUTLAW, perplexed by Ms. Krebs' hostile response, asked "why?"

75. In response, Ms. Krebs told Plaintiff OUTLAW, that she could do whatever she wanted and that Plaintiff OUTLAW could not do anything about it.

76. Soon thereafter, Plaintiff OUTLAW complained to Defendant CRISTODORA and asked Defendant CRISTODORA about the commission in question had been transferred away from her to Ms. Krebs. Plaintiff OUTLAW specifically explained to Defendant CRISTODORA that the customer came in and did not ask for Ms. Krebs, so Plaintiff OUTLAW was within her rights to work with the customer and make the sale.

77.   In response, Defendant CRISTODORA told Plaintiff OUTLAW that it did not matter because he was the manager and could make the final decision and that Ms. Krebs deserved half of the commission.

78.   Upon information and belief, in so doing, Defendant CRISTODORA treated Plaintiff OUTLAW differently on the basis of her race (African American).

79.   Soon thereafter, Plaintiff OUTLAW returned to the sales floor and told Ms. Krebs that Ms. Krebs was wrong and Ms. Krebs responded that she had the upper hand and Plaintiff OUTLAW had no rights.

80.   Plaintiff OUTLAW was deeply offended by this veiled discriminatory comment alluding to the fact that Defendant CRISTODORA and Ms. Krebs are white and will side with one another against Plaintiff OUTLAW, who is African American.

81.   In addition, Ms. Krebs' comment about Plaintiff having no rights continued to reinforce the racial stereotypes that Defendants had about their African American employees, as compared to their non-African American employees.

82.   In or around September 2017, Defendant CRISTODORA informed Plaintiff OUTLAW that Ms. Ramaglia again accused Plaintiff OUTLAW of touching Ms. Ramaglia in a sexually inappropriate manner.

83.   Defendant CRISTODORA told Plaintiff OUTLAW this is the second time Ms. Ramaglia was accusing Plaintiff OUTLAW of sexual harassment and Plaintiff OUTLAW told Defendant CRISTODORA that she had asked to have Human Resources involved in this matter, so it could be resolved.

84.   Upon information and belief, Ms. Ramaglia's claims were investigated and determined to be unfounded and baseless accusations. However, Ms. Ramaglia was never reprimanded for making these false allegations against Plaintiff OUTLAW. Defendants thereby

acquiesced to the discriminatory conduct of Ms. Ramaglia against Plaintiff OUTLAW, which caused Plaintiff OUTLAW to be subjected to a hostile work environment based on her race and sexual orientation, whether actual or perceived.

85. In or around October 2017, Plaintiff OUTLAW spoke with Ms. Beauchard and complained about: (a) the discriminatory and hostile work environment to which she was being subjected; (b) Ms. Ramaglia's false and defamatory sexual harassment allegations against her; and (c) Defendant CRISTODORA's failure to properly address these continuing and ongoing issues. Plaintiff OUTLAW expressed that she believed that this conduct was racially motivated. (the "October 2017 Complaint")

86. Upon information and belief, Ms. Beauchard is an African American female.

87. Ms. Beauchard responded that there have been many complaints from other African American sales employees about the same individuals, as well as, Defendant CRISTODORA's failure to address the discriminatory conduct. Ms. Beauchard continued that some type of mediation or intervention needed to occur, since this discriminatory conduct could not continue.

88. However, no such remedial effort was made for over a month.

89. During this time, the hostile work environment that Plaintiff OUTLAW was being subjected to on almost a daily basis became markedly worse.

90. For example, the white employees increasingly ostracized Plaintiff OUTLAW and she was continuously called into the manager's office.

91. Approximately five weeks after Plaintiff's October 2017 Complaint, Ms. Beauchard came to the Poughkeepsie Location and held a meeting with Plaintiff OUTLAW and Defendant CRISTODORA.

92.     During this meeting, Ms. Beauchard asked Plaintiff OUTLAW about what was happening at Poughkeepsie Location and Plaintiff OUTLAW explained that she was being continuously harassed by the white employees and that management, particularly Defendant CRISTODORA, was acquiescing to the discriminatory conduct.

93.     Defendant CRISTODORA alleged that there were numerous complaints against Plaintiff OUTLAW for being "loud on the floor," using her phone on the floor, walking off the floor and not taking her name off the Up List.

94.     Ms. Beauchard asked if Defendant CRISTODORA had actually witnessed any of this conduct and why there were no written complaints. Defendant CRISTODORA responded that he had not and that the only complaints against Plaintiff OUTLAW were from other (white) employees.

95.     Plaintiff OUTLAW then informed Ms. Beauchard that this discriminatory conduct was affecting her emotionally and that when she came to work, she would begin shaking nervously because of the discriminatory and hostile work environment that she was being subjected to on an almost daily basis.

96.     Ms. Beauchard continued by asking Defendant CRISTODORA what can be done to rectify this situation and why did she not hear about this conduct earlier.

97.     Defendant CRISTODORA claimed that he thought it was handled already. Plaintiff interjected stating that she was complaining on an almost daily basis because the discriminatory conduct was persistent.

98.     After the meeting, Ms. Beauchard took Plaintiff OUTLAW aside and told her that she would try and get to the bottom of what was happening and apologized for what Plaintiff OUTLAW had been going through.

99.   In or around late December 2017, or early January 2018, Diane Kolinsky was hired as a new Manager at the Poughkeepsie Location.

100.  Soon thereafter, Ms. Kolinsky also began harassing Plaintiff OUTLAW, after befriending Ms. Cacace, as well as two other Sales Consultants, Lenny Arias and Jill Salatti.

101.  Upon information and belief, Mr. Arias is a fair-skinned Puerto Rican male and Ms. Salatti is a white female.

102.  For example, Ms. Kolinsky and Defendant CRISTODORA would give the higher web sales to the white sales persons and would give the lower web sales to the non-white sales persons.

103.  In or around early February 2018, a customer came into the store and asked for Michael Phillips, a Sales Consultant. Plaintiff OUTLAW asked Ms. Ramaglia to page Mr. Phillips to assist the customer. However, upon information and belief, rather than page Mr. Phillips, Ms. Ramaglia began working with the customer (the "Early February 2018 Incident").

104.  Upon information and belief, Mr. Phillips is a bi-racial (African American and White) male.

105.  When Mr. Phillips came back to the showroom, Plaintiff OUTLAW asked Mr. Phillips if he had worked with the customer. Mr. Phillips responded in the negative. Plaintiff proceeded to point the customer out and told Mr. Phillips that the customer was with Ms. Ramaglia.

106.  Mr. Phillips then inquired with Ms. Ramaglia how she got the customer. Ms. Ramaglia replied that the customer requested her and circled her name.

107.  Soon thereafter, Ms. Ramaglia began yelling at Plaintiff OUTLAW, across the sales floor, and called Plaintiff a "fucking liar."  A number of employees and customers witnessed this offensive conduct. Ms. Ramaglia continued to call Plaintiff OUTLAW a liar, three more

times, in a rude tone. Mr. Phillips informed Ms. Ramaglia that her conduct was very unprofessional and that he would let Defendant CRISTODORA, know what she did.

108.   Other Sales Consultants, as well as Mr. Phillips, all witnessed Ms. Ramaglia's discriminatory conduct.

109.   Later, Plaintiff OUTLAW called Ms. Beauchard and complained about Ms. Ramaglia's recent discriminatory conduct, as well as, the continued discriminatory and hostile work environment that Plaintiff OUTLAW was being subjected to with the acquiescence of management.

110.   Ms. Beauchard responded that no one had informed her about the incident and that she would investigate and get back to Plaintiff OUTLAW. However, Ms. Beauchard never followed up with Plaintiff OUTLAW.

111.   In or around late February 2018, Defendant CRISTODORA approached Plaintiff OUTLAW and asked Plaintiff OUTLAW if she touched Ms. Ramaglia in a sexually inappropriate manner. While Defendant CRISTODORA made this accusation, he appeared to be smirking, in an attempt to not laugh.

112.   Plaintiff OUTLAW asked when this alleged conduct occurred and Defendant CRISTODORA claimed that it happened earlier that day. Plaintiff OUTLAW responded that she did not speak to Ms. Ramaglia, or interact with her because Ms. Ramaglia had been making false accusations against her. Plaintiff OUTLAW added that she had not yet seen Ms. Ramaglia that day.

113.   Upon information and belief, this accusation came directly from Defendant CRISTODORA and was only made in order to continue the discriminatory and hostile work environment that Plaintiff OUTLAW was being subjected to.

114.    On or about February 25, 2018, Plaintiff e-mailed Ms. Beauchard to complain about Defendant CRISTODORA's and the discriminatory conduct of the other white sales consultants towards her, listing various examples. Plaintiff OUTLAW also asked for assistance because management was acquiescing to the discriminatory conduct of the white sales force.

115.    In addition, Plaintiff OUTLAW informed Ms. Beauchard that she believed it was unfair that she had to work in an environment where she felt unsafe for her job and where she could not defend herself because there were no repercussions for her offending coworkers.

116.    Moreover, Plaintiff OUTLAW explained that she would wake up not wanting to come to work because she did not feel protected.

117.    Furthermore, Plaintiff OUTLAW felt that the white sales people, despite managers being fully informed, were continuing to harass her and treating her differently.

118.    However, Ms. Beauchard did not respond to the e-mail, thereby acquiescing to the offending discriminatory conduct.

119.    In or around March 2018, Ms. Beauchard came into the Poughkeepsie Location, after Plaintiff complained again, and spoke to Defendant CRISTODORA and Plaintiff OUTLAW, in the manager's office.

120.    During this meeting, Ms. Beauchard told Defendant CRISTODORA that there has to be some type of mediation because there were other non-white employees complaining about the discriminatory conduct of the white salesforce.

121.    Plaintiff OUTLAW proceeded to inform Ms. Beauchard about Ms. Ramaglia's continued discriminatory conduct, including the Early February 2018 Incident.

122.    Also, after being questioned, Defendant CRISTODORA admitted that Plaintiff OUTLAW had complained multiple times about issues she was having with the white salesforce. In

addition, Defendant CRISTODORA admitted that Plaintiff had stated that she felt singled out by her white co-workers.

123.   Plaintiff OUTLAW also explained that Defendant CRISTODORA and Ms. Kolinsky appeared to both enjoy making Plaintiff OUTLAW's work environment hostile and it had now caused Plaintiff OUTLAW to have anxiety attacks. In addition, Plaintiff OUTLAW explained that her anxiety had become so severe that she would begin to shake almost every day, when Plaintiff OUTLAW arrived at work.

124.   Despite this meeting, Plaintiff OUTLAW's hostile work environment worsened in retaliation for complaining about the discriminatory conduct.

125.   On or about March 9, 2018, Plaintiff OUTLAW text messaged Ms. Kolinsky and Michael Evans, another Sales Manager, and informed them that that she would be late to the morning meeting. Despite promptly informing Ms. Kolinsky and Mr. Evans, Mr. Evans still insisted on putting Plaintiff OUTLAW down as a late arrival.

126.   Upon information and belief, Ms. Kolinsky and Mr. Evans did not do this to the white employees.

127.   After the morning meeting, Ms. Kolinsky and Mr. Evans, began harassing Plaintiff OUTLAW about an order that was placed in the "Saturday Folder." Plaintiff explained that she was taught to inform the employees in the Customer Service Office about such an order and then have them place it in the appropriate folder.

128.   However, Mr. Evans continued to accuse Plaintiff OUTLAW of putting the form into the wrong folder, against store procedure. This in turn, prevented the customer from getting her purchase in a timely manner.

129.   Soon thereafter, Plaintiff OUTLAW went to the Acceptance Now ("ANOW") Office to check on an order for a customer and was told that the customer had returned on March 8,

2018, and Mr. Haubrich had re-written the order as a quote so as to take the deal away from Plaintiff OUTLAW.

130.   Plaintiff OUTLAW proceeded to make copies of the invoices and printed out the rules regarding how sales commissions were supposed to operate. Plaintiff OUTLAW showed this information to Ms. Kolinsky to explain that the sale was, in fact, hers and not Mr. Haubrich; however, Ms. Kolinsky took the papers away from Plaintiff OUTLAW, told her that she knew the rules, and threw the documents out without reading them.

131.   Later that evening, Ms. Kolinsky told Plaintiff OUTLAW that she would put the sale in, in a way that Plaintiff OUTLAW and Mr. Haubrich would share equally in the sale commission.

132.   Soon thereafter, Plaintiff OUTLAW complained to Defendant CRISTODORA about the stolen commissions. Defendant CRISTODORA told Plaintiff that Mr. Haubrich deserved half of the commissions and that the split would remain as is.

133.   Later, Plaintiff OUTLAW called Ms. Beauchard and complained about her commissions being given to Mr. Haubrich.

134.   Upon information and belief, Ms. Beauchard called Defendant CRISTODORA about the stolen commissions.

135.   Soon thereafter, Ms. Kolinsky told Plaintiff OUTLAW that the commissions will be returned to only Plaintiff OUTLAW's name, but that she still believed that Plaintiff OUTLAW was lying.

136.   On or about March 10, 2018, Plaintiff OUTLAW followed up with Defendant CRISTODORA about her complaint over the stolen commissions. Defendant CRISTODORA told Plaintiff OUTLAW that Mr. Haubrich would keep the commissions because it was Mr. Haubrich's client first.

137.   The following day, on or about March 11, 2018, Ms. Kolinsky called Plaintiff OUTLAW into her office to tell Plaintiff that she thought Plaintiff and Mr. Haubrich were both liars, but since ANOW orders are treated as open orders, Plaintiff OUTLAW would get all of the commissions.

138.   In or around the beginning of April 2018, Ms. Kolinsky had a huddle with Plaintiff OUTLAW and told her that she thought Plaintiff OUTLAW "was not good enough for the company"; that Plaintiff OUTLAW "added no value to the company" and that Plaintiff OUTLAW "should just leave."

139.   On or about April 21, 2018, Defendant CRISTODORA inquired of Plaintiff OUTLAW, Ms. Davis, and Mr. Rosa as to what they were doing at that moment, before calling Plaintiff OUTLAW and Ms. Davis "circus animals" and telling Mr. Rosa that he was the ringleader of the circus.

140.   In or around early May 2018, Plaintiff asked Defendant CRISTODORA if she could change her schedule to part-time. Defendant CRISTODORA denied Plaintiff OUTLAW's request for a part-time schedule.

141.   In or around late May 2018, Plaintiff OUTLAW again asked Defendant CRISTODORA, if she could switch to a part-time schedule. Defendant CRISTODORA again denied Plaintiff's request for a part-time schedule.

142.   On or about June 2, 2018, Defendant CRISTODORA told the employees that they could not eat during meetings because it was distracting. However, two Sales Consultants, Ashley Pacheco and Mr. Arias, both of whom are, upon information and belief, fair-skinned Hispanics, continued to eat.

143.   After this meeting, Ms. Kolinsky approached Plaintiff OUTLAW and told her that she did not like the look of the outfit Plaintiff OUTLAW was wearing, the day prior. Ms. Kolinsky

continued that Plaintiff OUTLAW's outfit was inappropriate and that it would cause customers to stare at Plaintiff OUTLAW's body. In addition, Ms. Kolinsky asked Plaintiff OUTLAW, if she was in front of a five-year-old, would she wear that type of outfit. Plaintiff OUTLAW responded to Ms. Kolinsky that she had worn the outfit multiple times before without an issue and that Ms. Kolinsky and the other white staff members were behaving in a very discriminatory and unprofessional manner towards her.

144.   Upon information and belief, Plaintiff OUTLAW's outfit was within the permitted dress code of Defendant BOB'S DISCOUNT FURNITURE.

145.   In addition, upon information and belief, Mr. Evans and Defendant CRISTODORA witnessed, and/or overheard, Ms. Kolinsky's discriminatory conduct.

146.   Later that day, Plaintiff OUTLAW complained to Ms. Beauchard about Ms. Kolinsky's offensive conduct relating to her attire from the day before and stated that Mr. Evans and Defendant CRISTODORA may have witnessed Ms. Kolinsky's rude and discriminatory conduct.

147.   Plaintiff OUTLAW continued and explained that every time Plaintiff had to "huddle" with Ms. Kolinsky, Ms. Kolinsky found a reason to insult Plaintiff OUTLAW.

148.   For example, Ms. Kolinsky has told Plaintiff OUTLAW that she does not deserve to be and employee of Defendant BOB'S DISCOUNT FURNITURE and that Plaintiff OUTLAW was not cut out to be a furniture sales person and should look for another type of career.

149.   Upon information and belief, Ms. Kolinsky's discriminatory comment reinforced the racial stereotypes that Defendants had about their African American employees, as compared to their non-African American employees.

150.   On or about June 3, 2018, Defendant CRISTODORA told Plaintiff OUTLAW that she

could not eat during the meeting. However, Mr. Arias and Ms. Pacheco, who were eating, were not told to not eat.

151.    On or about June 29, 2018, Plaintiff OUTLAW finally began working part-time, because she could not endure on a full-time basis the hostile work environment she was being subjected to at Defendant BOB'S DISCOUNT FURNITURE, race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

152.    On or about July 15, 2018, Defendants held an Anti-Harassment Meeting. This meeting was run by Defendant CRISTODORA, Mr. Evans, and Ms. Kolinsky.

153.    During this meeting, Defendant CRISTODORA, Mr. Evans, and Ms. Kolinsky discussed who an employee should report to, if they feel that they were being harassed or discriminated against, and identified a phone number that employees could call, if they want to complain about discrimination and/or harassment.

154.    After the meeting, all employees were required to sign off on a notice stating that they had attended the meeting.

155.    Upon information and belief, Defendant BOB'S DISCOUNT FURNITURE uses human resources professionals of color, particularly Defendant JACKSON and Ms. Beauchard as a means to circumvent claims of discrimination.

156.    On or about August 29, 2018, Plaintiff OUTLAW's attorneys sent Defendant BOB'S DISCOUNT FURNITURE a claim letter laying out her allegations of discrimination and retaliation.

157.    On or about November 16, 2018, Plaintiff OUTLAW filed her claims of discrimination and retaliation against Defendant BOB'S DISCOUNT FURNITURE in the Equal Employment Opportunity Commission.

158.    Since the then, Defendants have engaged in a pattern discriminatory and retaliatory conduct

towards Plaintiff OUTLAW for engaging in protected activity.

159.    Defendants' final and most egregious act occurred on July 13, 2019, when Defendants terminated Plaintiff OUTLAW for alleged misconduct, which allegations were unfounded.

160.    Specifically, Diane Kolinsky told Plaintiff that she was begin terminated for "inappropriately touching" another co-worker. Plaintiff denied the allegation and asked for further details surrounding the allegations, but was given none.

161.    Plaintiff OUTLAW felt offended, disturbed, and humiliated by the blatantly unlawful, discriminatory and retaliatory treatment she has suffered at the hands of Defendants.

162.    Plaintiff has been unlawfully discriminated and retaliated against on the basis of her race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

163.    Defendants' actions and conduct were intentional and aimed at harming Plaintiff.

164.    As a result of the acts and conduct complained of herein, Plaintiff OUTLAW has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation, which such employment entails.

165.    Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced emotional distress.

166.    As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

167.    The above are just some of the ways Defendants discriminated and retaliated against Plaintiff while employing her.

168.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, the Plaintiff demands punitive damages.

169. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Not Against Individual Defendants)**

170. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

171. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, for relief based upon the unlawful employment practices of the above-named Defendant BOB'S DISCOUNT FURNITURE. Plaintiff complains that Defendant BOB'S DISCOUNT FURNITURE violated Title VII's prohibition against discrimination or retaliation in employment based, in whole or in part, upon an employee's race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

172. Defendant BOB'S DISCOUNT FURNITURE engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e, *et seq.*, by discriminating and retaliating against Plaintiff because of her race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

173. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will each continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

174. Accordingly, as a result of the unlawful conduct of Defendant BOB'S DISCOUNT

FURNITURE, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this law.

## AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK STATE LAW
## (Against All Defendants)

175.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

176.   Executive Law § 296 provides that:

> 1.   It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

177.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiffs because of race (African American), sexual orientation, and/or gender/sex (female), whether actual or perceived.

178.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will each continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

179.   Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and each is entitled to the maximum compensation available to each of her under this law.

## AS A THIRD CAUSE OF ACTION
## UNDER STATE LAW AIDING AND ABETTING
## (Against Individual Defendants Only)

180.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

181.   New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

182.   Defendants, CRISTODORA and JACKSON, each engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct against Plaintiff.

183.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will each continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that her employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

184.   Accordingly, as a result of the unlawful conduct of Defendants, CRISTODORA and JACKSON, Plaintiff has been damaged as set forth herein and each is entitled to the maximum compensation available to each of them under this law.

## JURY DEMAND

185.   Plaintiffs each requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that Defendants engaged in, and enjoining Defendants from continuing to

engage in, unlawful employment practices prohibited by the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*; and the New York State Human Rights Law, New York State Executive Law, §§ 296, *et. seq.*, in that Defendants discriminated and retaliated against Plaintiff on the basis of her race (African American), sexual orientation, and/or gender (female), whether actual or perceived;

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make each of them whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven at trial;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff's attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices against her.

Dated: New York, New York
       August 19, 2019

                                    **PHILLIPS & ASSOCIATES,**
                                    **ATTORNEYS AT LAW, PLLC**


                          By:  _____
                                    Parisis G. Filippatos (PF1593)
                                    *Attorneys for Plaintiff*
                                    45 Broadway, Suite 620
                                    New York, New York 10006
                                    (212) 248-7431
                                    pfilippatos@tpglaws.com